**Glen H. SENGPIEL, Donald E. Kelly, and Donald R. Gottschalk, Plaintiffs–Appellants,**

v.

**The B.F. GOODRICH COMPANY, The B.F. Goodrich Pension Plan, The B.F. Goodrich Life Insurance Plan, The B.F. Goodrich Hospital–Surgical Medical Basic Plan, The B.F. Goodrich Prescription Drug Benefit Plan, The B.F. Goodrich Major Medical Plan, Uniroyal Goodrich Tire Company, Uniroyal Goodrich Pension Plan, The Uniroyal Goodrich Tire Company Health Care Plan, The Uniroyal Goodrich Tire Company Prescription Drug Plan, The Uniroyal Goodrich Tire Company Life Insurance Plan, and Michelin North America, Inc., Defendants–Appellees.**

No. 97–3832.

United States Court of Appeals, Sixth Circuit.

Argued July 29, 1998.

Decided Sept. 18, 1998.

James A. Rydzel (argued and briefed), Jones, Day, Reavis & Pogue, Cleveland, OH; Theodore E. Laszlo (briefed), The B.F. Goodrich Company, Richfield, OH, for Defendants–Appellees The B.F. Goodrich Co., The B.F. Goodrich Pension Plan, The B.F. Goodrich Life Insurance Plan, The B.F. Goodrich Hospital Surgical Medical Basic Plan, The B.F. Goodrich Prescription Drug Benefit Plan and The B.F. Goodrich Major Medical Plan.

Ronald S. Okada (briefed), John J. McGowan, Jr. (argued and briefed), Baker & Hostetler, Cleveland, OH, for Defendants–Appellees Uniroyal Goodrich Pension Plan, The Uniroyal Goodrich Tire Company Health Care Plan, The Uniroyal Goodrich Tire Company Prescription Drug Plan, The Uniroyal Goodrich Tire Company Life Insurance Plan and Michelin North America, Inc.

Before: SUHRHEINRICH and DAUGHTREY, Circuit Judges; McKEAGUE, District Judge.[*]

## OPINION

McKEAGUE, District Judge.

This litigation arises out of a corporate transaction in which B.F. Goodrich ("BFG") spun off its tire division to a new company that it had formed as a joint-venture with the Uniroyal Tire Company ("Uniroyal"). As part of this spin-off transaction, BFG transferred its obligation to provide certain retirees' pension and welfare benefits to the new company. The principal issues on appeal are whether, in effecting this transfer, BFG violated its fiduciary duties under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.* ("ERISA"), and whether the transferred retirees were denied benefits promised to them. The district court granted summary judgment in favor of defendants, finding that BFG did not act in a fiduciary capacity when it transferred the pension and welfare plan liabilities and that plaintiffs' contract-based ERISA claims failed because their welfare benefits did not

John L. Wolfe (argued and briefed), Akron, OH, for Plaintiffs–Appellants Glen H. Sengpiel, Donald E. Kelly and Donald R. Gottschalk.

[*] The Honorable David W. McKeague, United States District Judge for the Western District of Michigan, sitting by designation.

vest at the time of their retirement. We affirm.

### I.

Plaintiffs, Glen H. Sengpiel, Donald R. Gottschalk, and Donald E. Kelly, are retirees of defendant B.F. Goodrich. At the time of their retirement, each plaintiff worked in BFG's corporate department. Sengpiel retired in 1976 from his position as Corporate Director of Employee Relations; Gottschalk retired in 1981 from his position as Corporate Employee Relations Representative; and Kelly retired in 1982 from his position as a foreman in plant cleaning in one of BFG's facilities.[1]

In 1972, prior to ERISA's enactment, BFG distributed a binder to its employees entitled, "Design for Protection, B.F. Goodrich Salaried Benefit Program." The binder contained brochures describing five benefits programs: Hospitalization and Surgical, Pension, Life Insurance, Major Medical Insurance, and Prescription Drug. Only the major medical plan expressly reserved BFG's right to modify or discontinue the benefits offered.

In 1977, in conformance with the newly-enacted ERISA, BFG prepared the Company's first summary plan descriptions ("SPDs"), which it distributed to all salaried and wage employees in a portfolio. The first booklet in the portfolio, entitled "Highlights," summarized the benefits offered by BFG. The first paragraph of the Highlights booklet stated: "While the Company expects to continue these benefits indefinitely, it reserves the right at its option to change or discontinue any or all of the programs at any time." However, none of the individual SPDs in the portfolio contained a reservation of rights clause. Sengpiel had been retired a few months when the portfolio was distributed, but as Corporate Director of Employee Relations he was aware of the language in the Highlights booklet prior to his retirement. In 1981, BFG distributed revised SPDs and a new Highlights booklet containing the same reservation of rights clause. Again, none of the individual SPDs contained a reservation of rights provision. Gottschalk and Kelly retired in 1981 and 1982, respectively. In 1986, BFG sent an SPD for the Retiree Health Care Plan to all retirees, including plaintiffs, which contained the following clause: "The B.F. Goodrich Company expects to continue the Health Care Plan indefinitely but reserves the right to amend, suspend or terminate the Plan at any time."

In January 1986, BFG and Uniroyal reached an agreement to spin off their respective tire operations into a joint venture to be called Uniroyal Goodrich Tire Company ("UGTC"). Under this plan, BFG and Uniroyal would own UGTC in equal parts and each company would transfer all the assets and liabilities of its tire business to the new company. The liabilities included the pension and welfare benefit obligations to tire-related retirees. To accomplish this transfer, BFG split its retirement program into four separate plans (Salaried Tire, Wage Tire, Salaried Non–Tire, and Wage Non–Tire). All retirees who had retired from a department associated with BFG's tire division were assigned to a Tire pension plan.

In addition to transferring liability for the pension and welfare benefits of retirees who worked in the tire division, BFG decided that it was necessary to transfer the benefits liabilities for a portion of the corporate staff's retirees. The corporate staff serviced many different divisions, including the tire division. BFG concluded that based on its records, it was impossible to determine which retirees had worked most closely with the tire division throughout the course of their careers. Accordingly, BFG decided to select randomly a percentage of the corporate retirees that would be approximately equivalent to the percentage of BFG's business that had been devoted to tires, which was 42.54 percent. BFG then devised a method of selecting these corporate retirees whereby those retirees with social security numbers ending in 4254 or lower were assigned to the Tire

---

1. These plaintiffs were to become class representatives in the event that the district court certified this case as a class action. However, the district court elected to defer a decision on certification until after defendants' motions for summary judgment were decided and the issue subsequently became moot.

pension and welfare benefit plans that were then transferred to UGTC. Pursuant to ERISA requirements, BFG transferred funds sufficient to support its pension obligations to the transferred retirees. There being no similar ERISA requirement for welfare benefit obligations, however, BFG did not transfer any funds to UGTC for the transferred retirees' welfare benefits.

A provision in the joint-venture agreement between BFG and Uniroyal required UGTC to establish and adopt employee welfare benefit plans comparable to the plans offered by BFG and Uniroyal. The provision also specified that UGTC was to "assume all liability of Goodrich and Uniroyal for benefits under their present or past welfare plans or those of their predecessors for active, former and retired employees of the Goodrich Tire Business or the Uniroyal Tire Business."

Several of the retirees protested the transfer, including plaintiffs, both at the time the transaction was entered into and again in 1987 when BFG decided to sell its interest in UGTC to a private investment firm. Plaintiffs testified at their depositions that BFG's chief executive officer assured them that they would continue to be treated the same as retirees who remained under the BFG plan.[2]

In 1990, BFG amended its pension and welfare benefit plans for retirees by raising the deductible amount from $100 to $150. This increase was partially offset by a $40 increase in the retirees' monthly pension benefits. Plaintiffs were not impacted by these changes, however, because they had been transferred to the UGTC rolls as of 1986.

In 1995, UGTC reduced retiree health and life insurance benefits by raising deductibles and co-payment maximums, decreasing life insurance benefits, and imposing other changes in connection with Medicare coverage.[3] Also in 1995, UGTC was merged into Michelin North America, Inc. ("Michelin").

Plaintiffs do not challenge UGTC's right to reduce their benefits, as the UGTC plans (now sponsored and maintained by Michelin) have always expressly reserved the employer's right to amend the benefit plans. Rather, plaintiffs claim that defendants violated ERISA in transferring responsibility to pay their benefits to UGTC in the first instance.

## II.

We review the district court's grant of summary judgment de novo. *See, e.g., Walbro Corp. v. Amerisure Cos.*, 133 F.3d 961, 966 (6th Cir.1998). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Plaintiffs brought numerous claims before the district court stemming from the reduction of their welfare benefits.[4] On appeal,

---

**2.** BFG's chief executive officer also responded by letter to plaintiff Gottschalk and other retirees who complained about the transfer in 1987. This letter suggested that while UGTC was legally responsible for the retirees' benefits, the retirees could look to BFG to satisfy their rights if UGTC failed to provide them. The letter also stated explicitly, however, that it did not alter or expand those rights and that it did not waive the right to amend the welfare plans. The district court opinion discussed the implications of this letter at length. We do not address them here because the letter is relevant only to plaintiffs' equitable estoppel claims, which were not raised by plaintiffs on appeal, or to toll the statute of limitations, which the Court need not address in light of our holding affirming the district court's award of summary judgment to defendants on the merits.

**3.** Specifically, UGTC made the following changes: (1) reimbursement for cost of Medicare premium discontinued; (2) monthly costs of $10 per individual and $40 per family imposed for medical and prescription drug coverage; (3) annual deductible increased from $100 to $150 for individuals and from $200 to $300 for families; (4) annual co-payment maximum increased from $450 per individual and $550 per family to $1000 regardless of number of individuals covered; (5) coordination of Medicare benefits changed to presume coverage; and (6) life insurance benefit reduced from $25,000 to $5,000.

**4.** The district court noted that plaintiffs occasionally couched their complaint in terms of both pension and welfare benefits but that there was no real controversy regarding the pension plans. Plaintiffs have also suggested in various places throughout their appellate briefs that the transfer

however, plaintiffs raise only two arguments. First, plaintiffs argue that the district court erred in finding that BFG did not violate its fiduciary duties under ERISA. Second, plaintiffs challenge the district court's conclusion that their contract-based ERISA claims failed as a matter of law because their welfare benefits were not vested at the time of their retirement. We address each of these arguments in turn.

### A.

■ Plaintiffs argue that BFG violated its fiduciary duties under ERISA when it transferred the Tire welfare plan liabilities to UGTC without their consent. ERISA provides that a "fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104. The statute further specifies that a fiduciary's duties must be taken "for the exclusive purpose of ... providing benefits to participants and their beneficiaries...." *Id.* "Courts have read this section to impose 'an unwavering duty on an ERISA trustee to make decisions with single-minded devotion to a plan's participants and beneficiaries and, in so doing, to act as a prudent person would act in a similar situation.'" *Adams v. Avondale Indus., Inc.,* 905 F.2d 943, 946 (6th Cir.1990) (quoting *Morse v. Stanley,* 732 F.2d 1139, 1145 (2d Cir.1984)). Courts have also recognized, however, that "a corporation's fiduciary duties under ERISA do not encompass all of its activities." *United Steelworkers of Amer. v. Cyclops Corp.,* 860 F.2d 189, 198 (6th Cir.1988).

■ An employer that also acts as a plan administrator is said to wear "two hats." *See, e.g., Akers v. Palmer,* 71 F.3d 226, 231 (6th Cir.1995). Only when the employer acts in its fiduciary capacity must it comply with ERISA's fiduciary duties. ERISA defines a plan "fiduciary" as one who "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets" or who "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). Accordingly, courts have typically distinguished between employer actions that constitute "managing" or "administering" a plan and those that are said to constitute merely "business decisions" that have an effect on an ERISA plan; the former are deemed "fiduciary acts" while the latter are not. It is firmly established, for example, that "a company does not act in a fiduciary capacity when deciding to amend or terminate a welfare benefits plan." *Sutter v. BASF Corp.,* 964 F.2d 556, 562 (6th Cir.1992) (quoting *Adams v. Avondale Indus., Inc.,* 905 F.2d 943, 947 (6th Cir.1990)); *see also Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995) ("Employers or other plan sponsors are generally free under ERISA for any reason at any time, to adopt, modify, or terminate welfare plans.").

We agree with the district court that BFG's transfer of the retirees' welfare benefits is more analogous to amending, modifying, or terminating the then-existing welfare plans than to administering or managing them. In *Avondale,* an employer was deemed not to have acted in a fiduciary capacity when it amended its unwritten severance plan in conjunction with the sale of one of its divisions. *See Avondale,* 905 F.2d 943, 947 (6th Cir.1990). In so holding, it was noted, "[i]n drawing the line between employer actions subject to the fiduciary duty requirement and those not, we must avoid any rule that would have the effect of undermining Congress' considered decision that welfare benefit plans not be subject to a vesting requirement." *Id.* Similarly, in hold-

of their pension plans to UGTC was unlawful. As noted by the district court, however, it is clear that BFG satisfied its obligations under ERISA in transferring the pension plan liabilities. Section 208 of ERISA specifies that a pension plan liability may only be transferred if sufficient assets are also transferred to ensure that the plans are protected. *See* 29 U.S.C. § 1058. This Court has previously held that ERISA does not impose a fiduciary obligation on employers to guarantee future non-vested pension benefits to retirees. *See Dougherty v. Chrysler Motors Corp.,* 840 F.2d 2, 4 (6th Cir.1988). Accordingly, BFG did not violate its fiduciary duties under ERISA with respect to the transfer of the pension benefit obligations to UGTC.

ing that an employer did not act in a fiduciary capacity when it merged two existing pension plans, a panel of this Court cautioned against judicial interference in such business decisions: "A company's reason for treating a class of beneficiaries differently is not always readily ascertainable. For this reason, a court should be hesitant to substitute its judgment for that of the company." *Sutter*, 964 F.2d at 562 (quoting *Moore v. Reynolds Metals Co. Retirement Program for Salaried Employees*, 740 F.2d 454, 456, n. 3 (6th Cir. 1984)). BFG's decision to spin off its tire division and to transfer a share of its welfare benefit liabilities approximately equivalent to the portion of its business devoted to tires does not constitute discretionary plan administration according to the plan's terms or management of its assets.

Plaintiffs essentially concede that BFG's decision to spin off its tire division and its related decision to divide its welfare benefit plan into four smaller plans do not constitute fiduciary acts. They argue, however, that the company's selection of the affected retirees and their subsequent assignment to the transferred plans were discretionary acts of plan management or administration which are subject to ERISA's fiduciary standards. It is true that certain actions taken in the course of implementing a corporate business decision may be subject to ERISA's fiduciary standards even though the employer's decision itself is not. The Supreme Court has held, for example, that an employer acts in a fiduciary capacity when it intentionally misleads employees about the consequences of transferring their welfare benefit plans to a new entity created by a spin-off. *See Varity v. Howe*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). Drawing from the law of trusts, the Court concluded that "[c]onveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation, would seem to be an exercise of a power 'appropriate' to carrying out an important plan purpose." *Id.* at 502, 116 S.Ct. 1065. This Court recently acknowledged that an employer's explanation of benefits may be subject to ERISA's fiduciary standards. *See Sprague, et al. v. General Motors Corp.*, 133 F.3d 388, 405 (6th Cir.) (en

banc), *cert. denied*, —— U.S. ——, 118 S.Ct. 2312, 141 L.Ed.2d 170 (1998).

However, the fact that an action taken by an employer to implement a business decision may ultimately affect the security of employees' welfare benefits does not automatically render the action subject to ERISA's fiduciary duties. To adopt such a rule would, in effect, erode the well-established principle that employers are free to make decisions that modify, amend, or even terminate their employees' unvested welfare benefits. An employer is said to act in a fiduciary capacity when it communicates with employees about their benefits because, in essence, the employer puts on its plan administrator hat and undertakes action designed to carry out an important purpose of the plan. Here, BFG chose a formulaic method of dividing its welfare plans and assigning employees to those plans in order to facilitate its spin-off transaction. In so doing, BFG may well have exercised some degree of discretionary decision-making. However, it is not the exercise of discretion alone that makes an employer's action subject to ERISA's fiduciary standards. Rather, the statute and case law make clear that only discretionary acts of plan management or administration, or those acts designed to carry out the very purposes of the plan, are subject to ERISA's fiduciary duties. BFG's ministerial application of a percentage classification to implement its business decision does not amount to an exercise of discretion of this character. The district court correctly found that the actions undertaken by BFG to implement its business decision were simply not the kind of plan management or administration that trigger ERISA's fiduciary duties. *See, e.g., Systems Council, EM–3 v. AT & T*, 972 F.Supp. 21, 32 (D.D.C.1997) (holding that employer's "decisions to restructure itself and to spin-off its pension and welfare plans as part of the restructuring . . . . and the actions necessary to implement them are not subject to ERISA's fiduciary standards"); *see also Blaw Knox Retirement Plan v. White Consol. Indus.*, 998 F.2d 1185, 1189 (3d Cir.1993) (holding that an employer did not act in a fiduciary capacity in selling its unprofitable divisions and structuring the

transaction to include the existing pension plans).

■ Moreover, the district court also correctly concluded that even if it were assumed that BFG acted in a fiduciary capacity at some point in developing and implementing the spin-off transaction, plaintiffs have failed to establish that BFG breached its fiduciary duties. Although plaintiffs repeatedly assert that BFG's actions were taken "to benefit BFG" rather than the plan participants, plaintiffs point to no evidence that BFG benefitted at the participants' expense. In transferring the liabilities, BFG ensured that UGTC agreed to adopt welfare benefit plans comparable to its own. There is nothing in the record to suggest that BFG was motivated by bad faith or self-dealing considerations. Nor is there evidence that BFG's actions, when taken, were imprudent or manifestly adverse to plaintiffs' interests. Because welfare benefits are not vested, plaintiffs were in the same position after the transfer that they were in when the BFG plans still covered them. In fact, from 1990 until 1995, plaintiffs and their fellow transferred retirees were in better positions than their former colleagues still under the BFG plans. Michelin recently made a contribution to the retirees' pension fund that now makes their pensions fully-funded. Nothing in the record suggests that Michelin will ultimately be a less stable or secure sponsor of the retirees' benefit plans than BFG.[5] The record simply does not support a finding that BFG so abused its discretion in implementing the spin-off transaction as to justify the Court's substitution of its judgment for that of the company.

Plaintiffs have failed to show that BFG acted in a fiduciary capacity when it transferred the liability for their welfare benefits to UGTC. Plaintiffs have further failed to establish any breach of fiduciary duties, even if such duties were deemed to apply to BFG's conduct. For these reasons, we hold that the district court was correct in granting summary judgment to defendants on plaintiffs' breach of fiduciary duty claims.

### B.

■ Plaintiffs also argue that defendants breached their contractual duties under ERISA. The district court correctly held that plaintiffs cannot succeed on their contract-based ERISA claims because their welfare benefits were not vested at the time of their retirement.

■ While ERISA requires pension benefits to vest upon employees' retirement, welfare benefits do not automatically vest. *See* 29 U.S.C. § 1051(1) (excluding welfare benefit plans from ERISA's vesting provisions); *Helwig v. Kelsey–Hayes Co.*, 93 F.3d 243, 248 (6th Cir.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 690, 136 L.Ed.2d 613 (1997). However, employers may choose to vest welfare benefits by entering into a private agreement with their employees that is set forth in the plan documents. *See Inter–Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Ry. Co.*, 520 U.S. 510, 117 S.Ct. 1513, 1516, 137 L.Ed.2d 763 (1997); *Sprague, et al. v. General Motors Corp.*, 133 F.3d 388, 400 (6th Cir.) (en banc), *cert. denied,* — U.S. ——, 118 S.Ct. 2312, 141 L.Ed.2d 170 (1998). Because vested benefits are forever unalterable, and because employers are not legally required to vest them, this Court recently held that "the intent to vest [welfare benefits] 'must be found in the plan documents and must be stated in clear and express language.'" *Id.* (quoting *Wise v. El Paso Natural Gas Co.*, 986 F.2d 929, 937 (5th Cir.1993)). Plaintiffs bear the burden of proving that BFG intended to vest their benefits. *See id.*

The district court correctly found that the plan documents in this case do not express a

---

5. In addition, from a policy perspective, it would make little sense to adopt a rule requiring an employer to retain responsibility for paying all its employees' welfare benefits. As this Court has noted in the context of evaluating a similar rule urged upon us in the pension benefits context, such a rule would "have the ironic effect of encouraging companies to terminate plans rather than continue them in situations where employers transfer corporate assets." *Dougherty v. Chrysler Motors Corp.*, 840 F.2d 2, 4, n. 2 (6th Cir.1988). This is particularly so where, as here, the nature and size of the transaction require the employer to transfer sufficient liabilities in order to afford the transaction itself.

clear and affirmative intent to vest employees' welfare benefits. Regardless of whether the reservation of rights clause in the "Highlights" booklet may properly be considered part of the SPDs, there is simply no language in the SPDs themselves that clearly expresses an intention to vest the benefits.[6] Plaintiffs point to statements such as "if you retire and are eligible for a pension you shall continue to have the same health coverage," found in the 1977 Hospitalization Plan SPD, and argue that the language suggests an intent to continue benefits for the retiree's lifetime. We agree with the district court that such language neither expressly guarantees lifetime benefits nor creates an ambiguity as to whether such benefits are vested. Somewhat more persuasive but also insufficient to convey a clear intent to vest is language in the plans providing that a retiree's spouse will continue to receive benefits after the retiree dies "until death or remarriage." While this language may imply generally that benefits are to continue at the same rate provided to the retiree at his or her death, it falls far short of expressing a clear intent to render such benefits "forever unalterable." [7]

■ Plaintiffs also argue that BFG remains contractually liable for providing their welfare benefits because BFG failed to obtain the transferred retirees' consent. This argument also fails because plaintiffs' benefits were never vested. BFG never entered into a·contractual agreement to continue providing plaintiffs welfare benefits at the level they were receiving at the time of their retirement. Therefore, BFG did not improperly delegate such a contractual duty. Just as BFG would not have been required to obtain plaintiffs' consent if it decided to terminate their welfare benefits altogether, the company was not required to obtain their approval to transfer its liability for paying them. See Musto v. American General Corp., 861 F.2d 897, 912 (6th Cir.1988) (noting that an employer had no duty to establish a welfare benefit plan, "much less one that could never be amended without the approval of those to whom it applied").[8]

The plan documents do not express a clear intention by BFG to vest welfare benefits. Accordingly, we conclude that the district court correctly granted summary judgment to defendants on plaintiffs' contract-based ERISA claims.

## III.

Plaintiffs' complaint in this case stems from the perceived unfairness of their welfare benefits having been reduced. The district court correctly found, however, that plaintiffs cannot prevail on their claims where their benefits never vested and where no breach of BFG's fiduciary duties has been shown. ERISA simply does not impose the obligations on employers with respect to welfare benefit plans that plaintiffs seek to en-

---

6. At the time the relevant SPDs were issued, there were no actual "plans" separate and apart from the SPDs themselves. Accordingly, the only relevant plan documents are the SPDs.

7. Although the district court found that the plan documents were not ambiguous as to whether BFG intended to vest welfare benefits, the court also found in the alternative that even if the plan language were deemed ambiguous and extrinsic evidence of intent were considered, plaintiffs could not satisfy their burden of showing the requisite intent. We find no need to reach plaintiffs' arguments regarding extrinsic evidence because the plan documents are not ambiguous and do not express a clear intent to vest the welfare benefits.

8. In Howe v. Varity Corp., 36 F.3d 746 (8th Cir.1994), aff'd on other grounds, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), the court summarily concluded that an employer violated its fiduciary duties under ERISA when it transferred its obligation to pay retirees' benefits to a nearly-bankrupt company without informing the retirees' of the change or obtaining their consent. See id. at 756. The Supreme Court declined to review this portion of the Eighth Circuit's opinion because it construed the petition for certiorari as not having raised the issue. We find that the Eighth Circuit's holding as to the retirees is limited to the unique and egregious facts of that case, in which the employer deceived its employees and essentially attempted to conceal its underhanded actions with respect to the retirees by keeping them in the dark as to the status of their benefits. To the extent that the Eighth Circuit's holding is grounded in the retirees' lack of consent to the transfer, however, we agree with the district court's conclusion that it is an anomaly within the case law governing the scope of employer action subject to ERISA's fiduciary standards.

force.[9]  The judgment of the district court is **AFFIRMED**.

---

9.  In contrast, ERISA provides for automatic vesting of pension plan rights and places strict limitations on an employer's ability to transfer pension plan liabilities.  *See* 29 U.S.C. §§ 1051,

1058.  Plaintiffs cannot in this forum obtain a greater degree of security for their welfare plan benefits than that which Congress has required.